IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00027-01-CR-W-ODS |
| | ) | |
| MICHAEL K. SCOTT, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION**

Before the court is Defendant's Motion to Suppress Identification. Defendant moves the Court to suppress both out-of-court and in-court identifications on grounds that the photo array shown to Sandra Herdler was impermissibly suggestive. For the following reasons, Defendant's motion to suppress should be denied.

*I. BACKGROUND*

On June 19, 2009, Sandra Herdler was returning to work at the law firm located on the second floor of the Valley View Bank building. She had originally planned to park at the bank's main entrance to unload supplies, but declined to do so since a white van was already parked there. As she passed by the main entrance, she looked into the bank's glass doors and observed a man pulling a mask over his face. Ms. Herdler continued to the back parking lot and parked her vehicle. Because she believed the bank was being robbed, she called 911 and made her way to the front of the bank to get the white van's license plate number. As the white van left the bank, it slowly drove by the location where Ms. Herdler was standing. She was able to clearly see the faces of the men

1

inside the van. Ms. Herdler was shown a photo array on November 25, 2009, and positively identified Defendant as one of the men she saw leaving Valley View Bank on June 19, 2009.

An indictment was returned against Defendant on February 3, 2010. On April 11, 2011, Defendant filed a motion to suppress (Doc. No. 100). The government responded to Defendant's motion on April 18, 2011 (Doc. No. 104). I conducted an evidentiary hearing on June 13, 2011. The government appeared by Assistant United States Attorneys Bruce Clark and Joseph Vanover. Defendant was present, represented by appointed counsel John Picerno. The government called Sandra Herdler, FBI Special Agent Benjamin Kinsey and Kansas City, Missouri Police Department Detective Joseph Daneff to testify. The following exhibits were marked and admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Photo of entry to Valley View Bank |
| Government's Exhibit 2: | Photo of view of front door |
| Government's Exhibit 3: | Photo of parking lot |
| Government's Exhibit 4: | Photo of side of bank |
| Government's Exhibit 5: | Photo of side of bank and sidewalk |
| Government's Exhibit 6: | Photo of parking lot |
| Government's Exhibit 7: | Photo of driveway of bank |
| Government's Exhibit 8: | Photo of driveway of bank |
| Government's Exhibit 9: | Photo of driveway of bank |
| Government's Exhibit 10: | Photo array dated 11/25/09 at 10:17 |
| Government's Exhibit 11: | Photo array dated 11/25/09 at 10:19 |
| Government's Exhibit 12: | FBI 302 of Sandra Herdler dated 06/19/09 |
| Government's Exhibit 13: | FBI 302 of Sandra Herdler dated 11/25/09 |
| Government's Exhibit 14: | Transcript of 911 call |
| Government's Exhibit 15: | DVD of 911 call |
| | |
| Defendant's Exhibit 1: | Booking photo |

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. On June 19, 2009, the Valley View Bank in Kansas City, Missouri was robbed (Doc. No.

13).

2. Sandra Herdler is a paralegal at Krigel & Krigel, P.C., and Candace Livingston is a legal secretary at the same firm (Tr. at 4). Krigel & Krigel, P.C. is located on the second floor of the Valley View Bank building (Tr. at 4).

3. On June 19, 2009, Ms. Herdler and Ms. Livingston were returning to work from Costco (Tr. at 4). They entered the parking lot from Belleview, passing by the bank's main entrance (Tr. at 4-5; Gvt. Exh. 1). The doors to the main entrance are glass (Tr. at 2).

4. Ms. Herdler observed a white van parked in front of the bank (Tr. at 5). She planned to park in front of the white van in order to unload the lunch supplies they had purchased at Costco (Tr. at 6). She decided not to do so, however, because as she looked into the doors to the bank's main entrance she saw a man who was bent over and who looked like he was pulling a mask over his face (Tr. at 6). Ms. Herdler had a side view of the man and could see his face (Tr. at 21). Ms. Livingston said, "They're robbing the bank!" (Tr. at 6). Government's Exhibit 2 depicts Ms. Herdler's approximate location when she saw the man pulling on the mask (Tr. at 7).

5. Ms. Livingston was upset, so Ms. Herdler decided to park in the back parking lot (Tr. at 7-8; Gvt. Exh. 3). As depicted in Government's Exhibit 3, Ms. Herdler parked in the second spot from the light post (Tr. at 8-9; Gvt. Exh. 3). She then handed Ms. Livingston her cell phone to call 911, but Ms. Livingston was too upset (Tr. at 9). Ms. Herdler called 911 herself; it took three tries before she got through to an operator (Tr. at 9). As Ms. Herdler was calling 911, she walked across the parking lot and onto the sidewalk on the side of the bank (Tr. at 9). The sidewalk is depicted in Government's Exhibit 4 (Tr. at 9).

6. Ms. Herdler initially stood at the green sign (Tr. at 10; Gvt. Exh. 4). She was not able to see the van or either of the men from this location (Tr. at 24). When the 911 operator asked her to get the license plate number of the white van, she proceeded around the corner and ultimately stood at the location of the four windows (Tr. at 10, 25; Gvt. Exhs. 4, 5).

7. Ms. Livingston was standing on the grass behind the rose bushes depicted in Government's Exhibit 7 (Tr. at 26-27). From this location, she could see the front of the van and who was coming in and out of the bank's main entrance (Tr. at 27). Ms. Livingston shouted that the men were coming out of the bank, so Ms. Herdler did not look around the corner to get the license plate number and just continued to stand on the sidewalk near the four windows (Tr. at 11). From this vantage point, Ms. Herdler could not see anyone exit the bank or get into the van (Tr. at 28-29). As she stood there, the white van came around the corner slowly as would a regular customer; the occupants were not in a hurry (Tr. at 11, 13). Two men were in the front seat with their masks off (Tr. at 11). Ms. Herdler was eye level with the men and looked straight into the passenger widow of the van; she could see the men's faces clearly (Tr. at 11-12, 13, 29). Both men glanced in Ms. Herdler's direction, but did not look directly at her (Tr. at 29).

8. Ms. Herdler was able to observe the men between two to five seconds (Tr. at 30). She was approximately twelve to fifteen feet away (Tr. at 45). The lighting was good, as it was a sunny day (Tr. at 13). Although Ms. Herdler was nervous and/or scared, she was able to focus on the men's faces (Tr. at 13).

9. As the van drove past Ms. Herdler, she read the license plate number to the 911 operator (Tr. at 14; Gvt. Exh. 14).

10. The 911 operator wanted to speak to the bank manager (Tr. at 14; Gvt. Exh. 14). Ms. Herdler, therefore, walked to the main entrance of the bank (Tr. at 14). The manager was in the process of locking down the building, but upon learning a 911 operator wanted to talk to him let Ms. Herdler inside (Tr. at 14).

11. Ms. Herdler gave two statements regarding the incident -- one to FBI Special Agent Benjamin Kinsey on June 19, 2009 and one to FBI Special Agent Leena Ramana and Kansas City, Missouri Police Department Detective Joseph Daneff on November 25, 2009 (Tr. at 15; Gvt. Exhs. 12, 13).

12. Ms. Herdler testified at the suppression hearing she told Special Agent Kinsey that the man she observed in the bank's entryway putting on the mask was the passenger of the van (Tr. at 35-36). She estimated the passenger was in his late twenties and described him as being thin and having light skin (Tr. at 35-36). Ms. Herdler told Special Agent Kinsey that the passenger did not have anything on his head or face as the van passed by her (Tr. at 46, 59).

13. Special Agent Kinsey also testified that Ms. Herdler told him during the June 19, 2009 interview that the passenger was a black male, in his late 20's, thin build, had light skin and was not wearing a mask (Tr. at 59; Gvt. Exh. 12). However, he testified and his report states that Ms. Herdler told him the man in the lobby was the driver (Tr. at 59; Gvt. Exh. 12).

14. Ms. Herdler testified at the suppression hearing that she told Special Agent Kinsey that the driver had a fuller, rounder face and appeared to be shorter and stockier than the passenger (Tr. at 36, 42). The driver had a scruffy beard, a mustache and was in his late 20's (Tr. at 36). Ms. Herdler stated the driver had a red mask pulled over the top of his head, but that his full face was showing (Tr. at 36, 45).

15. Special Agent Kinsey testified Ms. Herdler described the driver as a black male, late 20's, approximately 5'6"-5'10" tall, wearing a white shirt, dark pants, that a painter-type mask covered his mouth and nose, and that he was wearing a red ski cap (Tr. at 58-59; Gvt. Exh. 12). Again, Special Agent Kinsey testified Ms. Herdler told him the driver was the man in the lobby (Tr. at 59; Gvt. Exh. 12).

16. Special Agent Kinsey testified Ms. Herdler did not provide him a description of either man's facial characteristics (Tr. at 61). He further testified that after interviewing Ms. Herdler on June 19, 2009, he was under the impression that she never saw the driver's face (Tr. at 67). Lastly, Ms. Herdler told him she saw both men exit the bank and get into the van (Tr. at 69).

17. The portion on page two of Special Agent Kinsey's June 19, 2009 report listing the suspect's the race, sex, age, build and complexion contains a typographical error, as it should describe the "second robber" rather than the "first robber" (Tr. at 68; Gvt. Exh. 12).

18. Ms. Herdler testified she was "not good" at estimating ages (Tr. at 36).

19. On November 25, 2009, Ms. Herdler spoke to FBI Special Agent Leena Ramana and Kansas City, Missouri Police Department Detective Joseph Daneff (Tr. at 16). She had not had any contact with law enforcement since the robbery (Tr. at 37).

20. Special Agent Ramana and Detective Daneff decided to meet with Ms. Herdler in part because Detective Daneff had reviewed the dispatch log and 911 dispatch tape and determined Ms. Herdler had more information than what was contained in Special Agent Kinsey's June 19, 2009 report (Tr. at 72, 91-92). Specifically, the 911 call revealed Ms. Herdler was actually on the phone as the van drove past her; there was nothing in the June 19, 2009 report that indicates she could make an identification (Tr. at 87-88).

21. Photo arrays were prepared in anticipation of Ms. Herdler's second interview (Tr. at 72).

22. The Kansas City, Missouri Police Department utilizes the Tiburon system to create photo arrays (Tr. at 73). Once a person of interest is identified, his or her identifying information is entered into the system (Tr. at 73). Officers entered Defendant's first, middle and last name, as well has his date of birth (Tr. at 73). The system produced a picture of Defendant that contained additional identifiers such as height, weight, date of birth, and age (Tr. at 73, 76). Upon hitting "create lineup," the computer generated approximately eighteen pictures that matched his identifiers (Tr. at 73). An officer then selected the pictures that most resembled Defendant (Tr. at 74). An eyewitness's description is taken into consideration (Tr. at 77).

23. Government's Exhibit 11 is the photo array that was prepared regarding Defendant (Tr. at 74). Despite the fact that Ms. Herdler described the robbers as being in their late 20's, the array only contains men in their 50's (Tr. at 78). Detective Daneff testified witnesses are often mistaken on age, especially in instances involving violent crimes (Tr. at 78). Law enforcement chose to use men in their 50's when creating the photo array because that was Defendant's age (Tr. at 78-79). Detective Daneff testified it would have been unfairly suggestive if the other individuals were 20-year-olds and Defendant was the only individual who was not in his 20's (Tr. at 89).

24. The information associated with Defendant's photo lists his height at 5'4" (Tr. at 86; Gvt. Exh. 11). The photograph of Defendant that was used was taken on March 24, 2009 (Def. Exh. 1).

25. Special Agent Ramana and Detective Daneff met Ms. Herdler at her office and showed her

the initial statement she gave (Tr. at 16). Ms. Herdler read the statement and pointed out inaccuracies concerning where she parked, whether the food had been unloaded, and where she stood (Tr. at 16, 38, 39). The corrected report was admitted as Government's Exhibit 13; Tr. at 76).

26. Special Agent Ramana and Detective Daneff also asked Ms. Herdler to describe the men's faces who she saw on the day of the robbery (Tr. at 16). Ms. Herdler described the driver of the van as having a rounder face, stockier build and as having a mustache (Tr. at 81; Gvt. Exh. 13). She also stated the driver had a ski mask on top of his head and the passenger had no mask on at all (Tr. at 89; Gvt. Exh. 13). She described the passenger as a black male, medium skin, unshaven and having short hair (Gvt. Exh. 13). Ms. Herdler indicated she continued to be able to visualize what she saw that day and believed she could identify the two individuals (Gvt. Exh. 13).

27. After the interview concluded, Special Agent Ramana and Detective Daneff showed Ms. Herdler two photo arrays (Tr. at 16, 41). She was only provided with the first page of each array (Tr. at 74). They told her to look at the photographs to see if she recognized anyone and stated that the men she observed the day of the robbery may or may not be contained in the photo array (Tr. at 41, 75). Ms. Herdler was told there was not a time limit and to take her time (Tr. at 75).

28. After reviewing each array, Ms. Herdler initialed and dated them (Tr. at 16). She did not take a particularly long time to make the identifications (Tr. at 75).

29. With regard to Government's Exhibit 10, Ms. Herdler identified the man in the second photograph (Claude White) as the passenger in the van on June 19, 2009 (Tr. at 75; Gvt. Exh.

8

13). With regard to Government's Exhibit 11, Ms. Herdler identified Defendant as the man in the fifth photograph who was the driver (Tr. at 42, 75; Gvt. Exh. 13). She did not have any difficulty identifying the individuals she saw driving away from the bank on the day of the robbery and was "very certain" in her identifications (Tr. at 18).

30. At the suppression hearing, Ms. Herdler agreed that she described the driver as having a round face (Tr. at 42). In looking at Government's Exhibit 11 while on the stand, she testified the men in all of the photographs had round faces except the man in the fourth photograph (Tr. at 42). Ms. Herdler agreed that she also described the driver as having a mustache (Tr. at 42). In looking at Government's Exhibit 11 while on the stand, she testified that the men in all but one of the photographs had a mustache (Tr. at 42).

31. Detective Daneff testified that to be really fair in showing an eyewitness a photo array, one would pick individuals as the eyewitness described (Tr. at 89-90). Detective Daneff further testified that in this case, however, he would not have shown Ms. Herdler a photo array of Defendant alongside men in their late 20's (Tr. at 90).

### III. LEGAL ANALYSIS

Due process challenges to an out-of-court identification are reviewed using a two-part test. First, the Court determines if the identification procedure was "impermissibly suggestive." United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003). See also United States v. Hines, 387 F.3d 690, 694 (8th Cir. 2004); United States v. Tucker, 169 F.3d 1115, 1117 (8th Cir. 1999); United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995); United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991); United States v. Donahue, 948 F.2d 438, 441 (8th Cir. 1991); United States v. Henderson, 719 F.2d 934, 936 (8th Cir. 1983). "When there are no differences in appearance

9

tending to isolate the accused's photograph, the identification procedure is not unnecessarily suggestive." Schawitsch v. Burt, 491 F.3d 798, 802 (8th Cir. 2007).

If the procedure was impermissibly suggestive, the Court must then determine whether, considering the totality of the circumstances, the suggestive procedure created "a very substantial likelihood of irreparable misidentification." Williams, 340 F.3d at 567 (citations omitted). See also Hines, 387 F.3d at 694; Tucker, 169 F.3d at 1117; Johnson, 56 F.3d at 953; Murdock, 928 F.2d at 297; Donahue, 948 F.2d at 441; Henderson, 719 F.2d at 936. Factors considered include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

Williams, 340 F.3d at 567 (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). See also Hines, 387 F.3d at 694; Tucker, 169 F.3d at 1118; United States v. Mack, 92 F.3d 637, 642 (8th Cir. 1996); Johnson, 56 F.3d at 954 (8th Cir. 1995); Murdock, 928 F.2d at 297; Henderson, 719 F.2d at 937.

In this case, the photo arrays presented to Ms. Herdler were not impermissibly suggestive. Defendant had been identified as a person of interest in the Valley View Bank robbery. Law enforcement, therefore, used the Tiburon System to compile a photo array using his identifiers. The system produced eighteen photographs of individuals with like characteristics. An officer then selected five photographs that closely resembled Defendant. Base on my review of Government's Exhibit 11, both the first page presented to Ms. Herdler and the second page she did not view, I find that the six photographs are substantially similar and that any differences do not tend to emphasize Defendant's photograph. Specifically, the photo array contains six black men. Their weights are similar, ranging from 158-161 pounds. The same is true for age; the years in which the individuals

contained in the array were born range from 1956-1962. They are all between 5'2" and 5'6".

Although Ms. Herdler told law enforcement the men she saw leaving Valley View Bank were in their late 20's, Detective Daneff testified witnesses are often mistaken on age, especially in instances involving violent crimes. Ms. Herdler even testified she was "not good" at estimating age. Again, Defendant had been identified as a person of interest. Detective Daneff testified, and I agree, that it would have been unfairly suggestive if Defendant was the only individual in the array not in his 20's. Furthermore, the photo array is not impermissibly suggestive because not all of the men have a mustache. See, e.g., United States v. Mays, 822 F.2d 793, 798 (8th Cir. 1987). When law enforcement presented the photo array to Ms. Herdler, they did not do anything to suggest either of the individuals she observed at Valley View Bank was included or suggest she should pick one photograph over the other. I do not find anything suggestive about this array.

Even if the procedure were impermissibly suggestive, I could not find that the array created a very substantial likelihood of misidentification. Ms. Herdler was able to get a good view of the men on the day of the robbery. She was able to see the face of the man in the bank's main entrance. Because there is some uncertainty as to whether this man was the driver or the passenger, the more important sighting occurred when both men drove by Ms. Herdler as they were leaving the bank. Ms. Herdler was able to see both men's faces for two to five seconds as the van slowly drove around the corner and exited the parking lot. She testified she was eye level with the men and stood only twelve to fifteen feet away. They glanced in her direction and she could see them clearly. Neither man's face was covered.

Ms. Herdler told Special Agent Kinsey that Defendant was a black male who was between 5'6"-5'10" and gave a detailed description of his clothing. Before she was shown the photo array,

11

she told Special Agent Ramana and Detective Daneff that Defendant had a rounder face, a stocky build and had a mustache. I note these characteristics are all consistent with Defendant's appearance as depicted in the photograph used in the array. Ms. Herdler told Special Agent Ramana and Detective Daneff she believed she could identify the individuals she saw on June 19, 2009. When shown the array, she identified Defendant quickly and was very certain in her identification. Special Agent Ramana and Detective Daneff presented Ms. Herdler with the photo array approximately five months after the Valley View Robbery. See United States v. Martin, 391 F.3d 949, 953 (8th Cir. 2004)(holding four months between robbery and viewing of photo spread did not create a substantial likelihood of irreparable misidentification); United States v. Wilson, 787 F.2d 375, 386 (8th Cir. 1986)(holding identification testimony had a sufficient basis for reliability even though more than four months had passed); United States v. Cook, 334 F. Supp. 771, 773 (D.C. Ark. 1971)(finding identification four and a half months after incident did not give rise to a very substantial likelihood of irreparable misidentification). As a result, there is no "substantial likelihood of irreparable misidentification." Defendant's motion to suppress should be denied.

## IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which

are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 3, 2011