IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,     )
                                )
          Plaintiff,      )
                                )
v.                        )      Criminal Action No.
                                )      10-00027-01-CR-W-ODS
                                )
MICHAEL K. SCOTT,          )
                                )
          Defendant.     )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Before the court is Defendant's Motion to Suppress Statements. Defendant moves the Court to suppress statements he made to law enforcement officers on November 20, 2008, November 21, 2008 and January 27, 2010 on grounds that he had not been Mirandized, his statements were not voluntary and because law enforcement continued to try to elicit information from him after he invoked his right to counsel. For the following reasons, Defendant's motion to suppress should be denied.

## *I. BACKGROUND*

Defendant was a suspect in a number of bank robberies that had taken placed in the Kansas City, Missouri metropolitan area. As a result of these suspicions, Defendant had law enforcement contacts twice in November of 2008 and once in January of 2010. He made statements during all three occasions.

An indictment was returned against Defendant on February 3, 2010. On April 11, 2011, Defendant filed a motion to suppress (Doc. No. 101). The government responded to Defendant's

1

motion on April 18, 2011 (Doc. No. 105). I conducted an evidentiary hearing on June 14, 2011. The government appeared by Assistant United States Attorneys Bruce Clark and Joseph Vanover. Defendant was present, represented by appointed counsel John Picerno. The government called Kansas City, Missouri Police Department Sergeant Lawrence White and FBI Special Agent Leena Ramana to testify. No exhibits were admitted into evidence.

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. On September 2, 2008, a Bank Midwest in Kansas City, Missouri was robbed (Tr. at 16; Doc. No. 13). Following the robbery, the FBI seized a green Jaguar registered to Defendant that was suspected to have been involved (Tr. at 16). After the car had been processed and searched, it was stored in the FBI's garage (Tr. at 32).

2. In early November of 2008, Special Agent Ramana received phone calls and a letter from Defendant requesting the Jaguar back (Tr. at 16-17). They made arrangements for Defendant to come to the FBI building to receive his vehicle on November 20, 2008 (Tr. at 17, 35).

3. When Defendant arrived at the FBI building, he was buzzed into the parking lot by a security guard (Tr. at 17, 37). He then entered the front lobby and went through security (Tr. at 17, 37). He waited in the lobby until Special Agent Ramana and Special Agent Arch Gothard arrived to meet with him (Tr. at 18). They gave Defendant a glass of water and told him they were having problems starting his car (Tr. at 38, 43).

4. An automotive technician tried to jump the dead battery in the Jaguar (Tr. at 18). The car was in the FBI's parking lot; Special Agent Ramana did not know when or by whom the car

2

had been moved from the garage (Tr. at 32-33).

5.    Special Agents Ramana and Gothard waited with Defendant in the lobby; although he was a suspect in the Bank Midwest robbery, Defendant was not under arrest and was free to leave during this time (Tr. at 18-19, 38, 39-40). Weapons were not drawn and Defendant was never handcuffed (Tr. at 19). The lobby remained open for other people to come in and out (Tr. at 19).

6.    Defendant was not advised of his Miranda rights (Tr. at 39).

7.    Special Agents Ramana and Gothard advised Defendant that they had seized his vehicle in relation to a bank robbery and asked Defendant where his car was on September 2, 2008 (Tr. at 19). Defendant stated he did not wish to answer that question (Tr. at 19). Defendant also stated he had spoken to a couple of attorneys (Tr. at 41).

8.    Special Agents Ramana and Gothard also requested Defendant provide a DNA sample (Tr. at 19-20). Defendant declined (Tr. at 20).

9.    Special Agents Ramana and Gothard informed Defendant he did not have to talk to them if he did not want to (Tr. at 20). They continued to sit in the lobby with Defendant, during which time Defendant began talking about his family, upbringing and criminal history (Tr. at 20). Defendant volunteered he had been in jail before and that he was housed next to the Trenchcoat robbers; because of this, he was able to talk about different methods of robbery (Tr. at 20-21). Special Agent Gothard asked some follow-up questions about the Trenchcoat robbers (Tr. at 44-45). Defendant also said he would not have used his own foreign-made Jaguar to drive to the front doors during a bank robbery, but would steal a car or cars and use those vehicles (Tr. at 22). He volunteered that people who would use their own vehicle "are

3

youngsters" (Tr. at 23, 42). Special Agent Ramana testified that when Defendant stopped talking, so did they; after a pause and silence, he would start talking again (Tr. at 45).

10. After Defendant left the FBI building, Special Agents Ramana and Gothard retrieved the cup that remained on a coffee table from which Defendant drank (Tr. at 43).

11. The automotive technician was not able to jump the battery in Defendant's Jaguar and wanted to keep working on it (Tr. at 24). When the technician was unsuccessful again the next day, Special Agent Ramana contacted Defendant and it was decided they would tow the Jaguar to Defendant's apartment (Tr. at 24).

12. On November 21, 2008, Special Agents Ramana and Gothard met Defendant in the parking lot of Defendant's apartment complex (Tr. at 25). The parking lot was, and remained, open to the public (Tr. at 25). The agents did not have any intention of arresting Defendant (Tr. at 46).

13. As they released the Jaguar to Defendant, Special Agents Ramana and Gothard had Defendant sign a release of property form and advised him that a ski hat with eye holes cut out of it had been seized (Tr. at 25-26). Defendant was not asked where he got the hat, but volunteered that his old employer had given it to him (Tr. at 26). Special Agent Gothard asked Defendant if he was saying the hat was his; Defendant declined to answer (Tr. at 26). Defendant then asked Special Agent Gothard if the FBI had taken a ski suit out of the Jaguar's trunk (Tr. at 26-27). He responded they had not (Tr. at 27).

14. While they were waiting for the Jaguar to be taken off the tow truck, Special Agent Ramana noticed Defendant was wearing a hat that had Hawaii on it and asked him if he had been to Hawaii (Tr. at 27). Defendant responded he had gone to Hawaii approximately one year

prior (Tr. at 27).

15.     Special Agent Ramana testified Defendant was not under arrest while they were in the parking lot (Tr. at 27). He was not in handcuffs and was free to leave (Tr. at 27). The agents did not draw their guns or make any threats (Tr. at 28).

16.     On January 27, 2010, the Commerce Bank in Parkville, Missouri was robbed. Commerce Bank uses an Electronic Tracking System, which allows it to put an item between their money that gives out a radio frequency (Tr. at 4). Kansas City, Missouri Police Department patrol cars have tracking devices that pick up a signal from the radio frequency (Tr. at 4).

17.     On January 27, 2010, Kansas City, Missouri Police Department Sergeant Lawrence White heard a broadcast from the dispatcher about the bank robbery (Tr. at 4). His patrol car picked up a signal from the Electronic Tracking System; he, therefore, pursued the vehicle from which the signal was originating until the vehicle crashed into a terrace (Tr. at 4-6, 9).

18.     Sergeant White observed Defendant running away from the vehicle (Tr. at 6, 8). Defendant was one or two steps in front of the driver's door, which was open (Tr. at 9). Sergeant White did not see anyone else outside of the vehicle (Tr. at 9).

19.     Sergeant White identified himself as a police officer and ordered Defendant to freeze (Tr. at 6). Defendant told Sergeant White that he did not have a gun (Tr. at 6). Sergeant White had not previously asked Defendant if he had a gun (Tr. at 7).

20.     Sergeant White then placed Defendant under arrest and walked him back to the patrol car (Tr. at 6, 7).

21.     After being arrested, Defendant was transported to FBI headquarters (Tr. at 28). Special Agent Ramana and Detective Daneff met with Defendant in an interrogation room (Tr. at

29). Defendant was in handcuffs (Tr. at 46). They introduced themselves and Special Agent Ramana began obtaining biographical information from Defendant such as his name, date of birth, social security number and address (Tr. at 30). While obtaining this information, Defendant stated he was just walking in the area when police almost hit him and arrested him (Tr. at 30). This statement was not made in response to a question (Tr. at 30). Defendant also volunteered that he did not rob a bank (Tr. at 30-31).

22. Defendant was then advised of his <u>Miranda</u> rights (Tr. at 31). Defendant stated he did not want to talk without an attorney (Tr. at 31, 48). Pursuant to routine practice, Special Agent Ramana and Detective Daneff began to inform Defendant what would happen next -- that he would be transported to the Western District of Missouri, turned over to the United States Marshals and that he would have an initial appearance and detention hearing (Tr. at 31, 49). Defendant asked if he would be detained (Tr. at 31). He was advised that it was a possibility, since the Government typically sought detention in cases involving bank robberies (Tr. at 31). Defendant then voluntarily asked if anybody was hurt in the other robberies (Tr. at 31, 50). At no time did Special Agent Ramana or Detective Daneff tell Defendant about anything that had occurred in any of the robberies in which he was a suspect (Tr. at 50).

### III. LEGAL ANALYSIS

Defendant makes Fifth and Sixth Amendment challenges to the statements he made on November 20, 2008, November 21, 2008 and January 27, 2010. Under the Fifth Amendment, Defendant maintains his statements should be suppressed both because he was not Mirandized and because the statements were involuntary. He further challenges his statements under the Sixth Amendment's right to counsel. The applicable law will be set forth below, followed by analysis of

Defendant's statements by date.

## Miranda

In Miranda v. Arizona, the United States Supreme Court held that in order for statements obtained during a custodial interrogation to be used at trial, law enforcement officers must have first advised the defendant of his Constitutional rights. 384 U.S. 436, 444 (1966). Miranda warnings are thus only required when a suspect is (1) interrogated (2) while in custody. United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992); United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990); Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989)(citing Rhone Island v. Innis, 446 U.S. 291, 300 (1980)). A defendant's invocation of his right to counsel under Miranda must be clear and unequivocal. United States v. Cloud, 594 F.3d 1042, 1046 (8th Cir. 2010).

"Custody occurs either upon formal arrest or any other circumstances where the suspect is deprived of his freedom of action in any significant way." Griffin, 922 F.2d at 1347 (emphasis omitted). Determination of whether an individual is in custody involves examination of whether "a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." Id. Indicia of custody include whether: (1) "the suspect was informed at the time of questioning that the questioning was voluntary"; (2) "the suspect possessed unrestrained freedom of movement during questioning"; (3) "the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions"; (4) "strong arm tactics or deceptive stratagems were employed during questioning"; (5) "the atmosphere of the questioning was police dominated"; or (6) "the suspect was placed under arrest at the termination of the questioning." Id. at 1349. This determination is based on the totality of the circumstances. Id.

For purposes of Miranda, an "interrogation" refers to "any questioning or conduct that the

government officer should know is reasonably likely to elicit an incriminating response from the suspect." United States v. McLaughlin, 777 F.2d 388, 391 (8th Cir. 1985)(citing Innis, 446 U.S. at 301). "[A] request for routine information necessary for basic identification purposes is not interrogation." United States v. Lockett, 393 F.3d 834, 837 (8th Cir. 2005)(citing United States v. Reyes, 908 F.2d 281, 287 (8th Cir. 1990)). See also Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990)(holding questions regarding name, address, height, weight, eye color, date of birth and age did not constitute interrogation). Similarly, spontaneous statements or statements made voluntarily, as opposed to those made in response to interrogation, are admissible regardless of whether Miranda warnings were given. See, e.g., United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005); United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998)(quoting United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995)); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996); Lawrence, 952 F.2d at 1035; United States v. Waloke, 962 F.2d 824, 829 (8th Cir. 1992); Butzin, 886 F.2d at 1018.

### Voluntariness

A statement is voluntarily given when, in light of the totality of the circumstances, the defendant made the statement on his own accord rather than as a result of succumbing to improper pressure from law enforcement officers. See Davis v. North Carolina, 384 U.S. 737, 739 (1966). In determining if a statement was voluntarily given, courts consider whether the statement "was extracted by threats, violence or direct or implied promises, such that the defendant's 'will [was] overborne and his capacity for self-determination critically impaired.'" United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)(citations omitted).

### Sixth Amendment - Right to Counsel

It is well settled that "the Sixth Amendment right to counsel does not attach until 'the

initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" United States v. Morriss, 531 F.3d 591, 593 (8th Cir. 2008).

## A.     November 20, 2008 Statements

Defendant's statements to Special Agents Ramana and Gothard should not be suppressed pursuant to Miranda because Defendant was not in custody. Defendant initiated contact with Special Agent Ramana in order to retrieve his Jaguar; he voluntarily came to the FBI to do so on November 20, 2008. Defendant met with Special Agents Ramana and Gothard in the lobby of the FBI building. The lobby was open for people to enter and exit, and Defendant was free to leave at any time. Defendant was informed that he did not have to talk to the agents. He was not placed in handcuffs and his freedom of movement was unrestrained. Strong arm tactics were not used. In fact, when Defendant stopped talking, so did the agents. Defendant was not placed under arrest; he returned home after the automotive technician could not get his car to start. I note that even if Defendant were to be found to have been in custody, his statements still should not be suppressed since they were volunteered on Defendant's own initiative rather than being made in response to interrogation.

Defendant's statements similarly should not be suppressed on grounds that they were involuntary. The totality of the circumstances demonstrate Defendant's will was not overborne. Special Agents Ramana and Gothard did not exert improper pressure over Defendant; their weapons were not drawn and there is no evidence that any threats or promises were made. The agents informed Defendant they did not have to speak to them if he did not want to, and when Defendant stopped talking so did they.

Additionally, the Sixth Amendment should not prohibit the admission of Defendant's

9

statements at trial. Defendant's statement that he had spoken to a couple of attorneys is not a request for counsel. Even if it could be construed as a request for such, the Sixth Amendment is not implicated as adversary judicial criminal proceedings had not yet been instituted against Defendant.

Lastly, although not expressly challenged by Defendant, the DNA obtained from the cup Defendant left on the coffee table should not be suppressed as the warrantless search of abandoned property does not violate the Fourth Amendment. United States v. James, 353 F.3d 606, 615-16 (8th Cir. 2003); United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997); United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994); United States v. Green, No. 09-00139-01-CR-W-DGK, 2010 WL 5502347 at * 7 (W.D. Mo. Dec. 14, 2010). Defendant's motion to suppress should be denied with regard to his November 20, 2008 encounter with law enforcement.

**B.      November 21, 2008 Statements**

Defendant's statements to Special Agents Ramana and Gothard should not be suppressed because, again, Defendant was not in custody. Defendant met Special Agents Ramana and Gothard in the parking lot of his apartment complex. The parking lot was open to the public. Defendant's freedom was unrestrained, as he was not in handcuffs and was free to leave. Special Agents Ramana and Gothard had no intention of arresting Defendant on November 21, 2008 and, in fact, did not do so. Strong arm tactics were not used.

Likewise, Defendant's statements were not involuntary. The agents did not draw their guns or make any threats. The totality of the circumstances demonstrate Defendant's will was not overborne.

Nothing in the record before me suggests Defendant invoked his right to counsel on November 21, 2008.

Defendant's motion to suppress should be denied on this ground.

**C.     January 27, 2010 Statements**

Defendant made statements at two different points on January 27, 2010 -- immediately prior to his arrest and at FBI headquarters following arrest.

**1.     Prior to Arrest**

Defendant's motion to suppress states that his statements were the direct result of an unlawful arrest. Defendant's arrest was not unlawful, as Sergeant White had probable cause to make the arrest. United States v. Webster, 625 F.3d 439, 442 (8th Cir. 2010)("Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime."). Sergeant White knew the Commerce Bank had been robbed. He followed the vehicle from which the bank's Electronic Tracking System signal was originating. When the vehicle crashed into a terrace, he observed Defendant one or two feet in front of the driver's door which was open. Sergeant White did not see anyone else outside the vehicle. These circumstances gave Sergeant White probable cause to arrest Defendant.

After Sergeant White ordered Defendant to freeze, Defendant stated he did not have a gun. Sergeant White had not previously asked Defendant if he had a gun. Although Miranda warnings had not been administered to Defendant, this statement should not be suppressed as it was volunteered rather than made in response to interrogation.

Likewise, Defendant's statement was voluntarily made. Sergeant White did not make any threats or promises to Defendant. Sergeant White had only ordered Defendant to freeze; he had not asked Defendant any questions or otherwise interrogated him. Nothing in the record before me

suggests Defendant's will was overborne. Defendant's motion to suppress with regard to his pre-arrest statements on January 27, 2010 should not be suppressed.

### 2. Post Arrest

After Defendant was arrested and taken to FBI headquarters, he was undisputedly in custody. Analysis under Miranda will, therefore, focus on whether Defendant's statements were made in response to interrogation. The statements Defendant made in response to Special Agent Ramana's request for biographical information fall within the booking exception to Miranda. Defendant's statement that he was walking in the area when police almost hit and arrested him was not made in response to interrogation but was, rather, volunteered by Defendant. Defendant's question about whether anyone was hurt in the robberies was also volunteered; neither Special Agent Ramana nor Detective Daneff had even mentioned anything about any of the robberies in which Defendant was a suspect. Having found this statement was not made in response to direct questioning, I also find that it was not in response to conduct designed to elicit an incriminating response. Special Agent Ramana testified they always explain to an individual who has been arrested what was going to happen and where they would be taken. Upon being told he would be taken to the Western District of Missouri, Defendant asked if he would be detained and inquired whether anyone had been hurt. Defendant's motion to suppress should be denied on this basis.

Defendant's motion should also be denied on grounds that his statements were involuntary. The record does not contain any evidence that Special Agent Ramana and/or Detective Daneff exerted any improper pressure over Defendant or that Defendant's will was in any way overborne.

### IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 3, 2011